Argued February 7, reversed May 22, petition for rehearing
denied June 19, 1957

# HOUSLEY ET UX v. LINNTON PLYWOOD ASSOCIATION

311 P. 2d 432

*James C. Dezendorf* argued the cause for appellant. On the briefs were Koerner, Young, McColloch & Dezendorf, James H. Clarke and Marshall C. Cheney, Jr., Portland.

*Ray B. Compton,* Roseburg, argued the cause for respondents. With him on the brief was Earl P. Conrad, Toledo.

Before PERRY, Chief Justice, and LUSK, WARNER and KESTER, Justices.

LUSK, J.

ON MOTION TO DISMISS APPEAL

On February 5, 1957, the respondents, plaintiffs in the court below, filed a motion to dismiss the appeal based on the ground that the judgment has been fully satisfied and the appeal is, therefore, moot.

The suit is one to foreclose a mortgage on timber lands and timber in Lincoln County, Oregon. On September 29, 1954, the court entered a decree of foreclosure ordering the property covered by the mortgage to be sold to satisfy a judgment entered against the defendants in the sum of $70,000, with interest thereon at the rate of six per cent per annum, $3,000 attorneys' fees, and costs and disbursements. On November 12, 1954, the defendant served and filed notice of appeal from this decree.

The question whether the appeal is moot must be determined in the light of the following facts: While the suit was pending in the circuit court, on August 20, 1952, defendant entered into a contract in writing by which it agreed to sell the mortgaged property to Willamette Valley Lumber Company (hereinafter called

Willamette), and the latter agreed to buy it for a price of $12,000 plus an amount equal to $10 per thousand feet of the merchantable fir, hemlock, and cedar timber standing on the premises, as would be determined by a cruise to be made by a firm to be jointly employed by the buyer and seller. The total purchase price exceeded $220,000. The sale was closed in October, 1952. With reference to the pending foreclosure suit, the parties to the contract agreed that $80,000 of the purchase price should be withheld and paid in the manner thereafter stated. Among other things it was stipulated that, if a decree of foreclosure should be entered and remain in effect for 15 days after its entry, the buyer, Willamette, "shall, at its sole discretion, and in the name of the Seller, if such appears advisable, pay into court, or to the plaintiffs in said suit, the sum required to satisfy said decree and all costs and disbursements allowed plaintiffs in said suit, and if the amount so paid be less than $80,000, shall pay the remainder to Seller" (the defendant herein). The contract further provided that, in the event of a decree favorable to the defendant which should not be set aside or from which no appeal should be taken, or which should be affirmed on appeal, the buyer would pay to the seller the entire sum of $80,000.

Thus, the parties agreed on withholding of the sum of $80,000, either to be applied toward satisfaction of the decree of foreclosure, should one be entered, or to be paid ultimately to the defendant, depending upon the outcome of the foreclosure suit.

Under date of October 18, 1954, which was more than 15 days after the entry of the decree, Mr. Ralph H. King, attorney for Willamette, addressed a letter to the defendant stating that he had been furnished a copy of the decree of foreclosure by Mr. Ray B. Comp-

ton, attorney for plaintiffs, with the information that the amount due on the judgment was $84,700. The letter continued:

"* * * We promptly advised Mr. Birnie [attorney at that time for the defendant] of the receipt of Mr. Compton's letter and that Mr. Compton offered to accept $80,000 in settlement of said decree. Mr. Birnie advised that you would deposit $4,700 in court and prosecute an appeal.

"On October 14, 1954, the writer talked with Mr. Birnie on the telephone, and Mr. Birnie stated that you were unable to deposit the $4,700."

The letter proceeded to give the defendant notice that, in order to protect its ownership of the property and to prevent the sale of the property under the decree of foreclosure, Willamette would, on October 20, 1954, pay $80,000 towards the satisfaction of the decree of foreclosure, and apply to the plaintiffs for a satisfaction of the mortgage. Under date of October 20, 1954, Mr. Birnie, on behalf of the defendant, answered the foregoing letter of Mr. King stating that (1) the defendant would appeal to the Supreme Court of Oregon from the decree but would be unable to procure a supersedeas bond; (2) that he (Mr. Birnie) had advised Mr. King that the defendant "would not consent to a compromise payment" for the reason that it intended to appeal from the decree and the defendant would not be a party to any compromise of the decree, and, if Mr. King should pay $80,000 by way of compromise, he would do so without the consent of the defendant. Mr. Birnie further stated that he did not recall making a statement that his client would deposit any money in court in connection with the appeal. On October 19, 1954, Mr. King delivered a certified check of Willamette in the amount of $80,000 to the clerk of the Circuit Court for Lincoln County as a payment on the

judgment. On October 20, Mr. Compton, as attorney for the plaintiffs, satisfied the judgment of record, and the plaintiffs executed and delivered to Willamette Valley Lumber Company a satisfaction of the mortgage.

On October 21, Mr. King advised Mr. Birnie of the foregoing by letter in which he stated no arrangement had been made with Mr. Compton or Mr. Housley that the sum so paid was in compromise of the claim asserted. However, he added, after the payment had been made to the clerk, Mr. Compton satisfied the judgment docket in full and thereupon received delivery of the check from the clerk.

The foregoing facts appear in affidavits submitted by the defendant and are not disputed.

■■ When a judgment or decree is rendered against a party his payment of the sum awarded will not preclude him from maintaining an appeal unless it satisfactorily appears that the payment was voluntary, not coerced, and made with the view of settlement. *Cottrell v. Prier,* 191 Or 571, 573, 231 P2d 788. The evidence before us shows that the payment of $80,000 was made by Willamette pursuant to the terms of its contract with the defendant in order to prevent the threatened sale on execution of the mortgaged property. Willamette had no authority under its contract to bargain away the defendant's right of appeal, and it did not attempt to do so. Although the attorney for the plaintiffs had informed Mr. King that his clients would accept $80,000 in settlement of the decree, payment of that sum to the clerk of the court did not constitute a payment made pursuant to a compromise agreed upon. The defendant refused to become a party to such a compromise, and no legal duty rested upon the plaintiffs to satisfy the judgment to any greater ex-

tent than the amount paid. Had the offer to settle been made by the defendant and accepted by it, or had the defendant authorized the offer instead of objecting to it, a different question would have been presented. In the circumstances disclosed by the record no inference of an intention on the part of the defendant to settle the case can properly be drawn. The payment made was a coerced payment, and hence the motion to dismiss the appeal should be, and it is, denied.

## On the Merits

The defendant is a cooperative association organized under the laws of this state for the purpose of manufacturing veneer and plywood.

The mortgage sought to be foreclosed was given to secure a note for the balance of the purchase price of timber lands in Lincoln County, Oregon, sold by the plaintiffs to the defendant. The total purchase price was $322,000, of which $202,000 was paid in cash by the defendant and the balance represented by a note and mortgage in the amount of $120,000 executed by the defendant on June 25, 1951. The sum of $50,000 was paid on the note prior to the commencement of this suit, which was filed January 23, 1952.

On March 28, 1952, the defendant filed a pleading denominated "Answer and Counter-Claim" in which it alleged that, in order to induce the defendant to purchase the lands in question, the plaintiffs, John J. Oxley, Jay A. Williams and Lester McConkey, entered into a conspiracy to defraud the defendant, and, in furtherance of said conspiracy, falsely represented to defendant that said lands contained in excess of 30 million board feet of timber; that one-half of such timber was suitable for peeler logs and the remainder for sawmill logs; and that the lands were accessible by

public roads; whereas the facts were that there were only 20 million board feet of timber; and only five percent were peeler logs and the remainder were second-growth sawmill logs and poles; and that the timber could be reached only by traversing private lands. The answer alleged the actual value of the lands to be only $200,000 and that the defendant had been damaged in the sum of $52,000, "this being the difference between the sum of money which defendant has paid to plaintiffs on account of the purchase price of such real property and the true and actual value thereof." The prayer was for a decree "rescinding, terminating and declaring to be void and of no force or effect the said promissory note and mortgage."

On March 1, 1954, defendant filed its so-called "amended and supplemental answer and cross-complaint" in which it set up the entire transaction, of which the execution of the mortgage was a part, and re-alleged substantially the fraudulent conspiracy described in its original answer. In this pleading it was alleged that the lands covered by the mortgage contained 22,502,000 board feet of timber; that only four percent were peeler logs; that at the time of the defendant's purchase thereof the timber lands had an actual value of $223,465, and that the defendant was damaged in the sum of $98,535. The answer further alleged that during 1952 defendant sold the timber lands to Willamette Valley Lumber Company, a corporation, for the price of $226,170, and that this was a sale which it was forced to make in order to avoid liquidation and dissolution of the association. The prayer was for a cancellation of the note and mortgage, restoration to defendant of all sums paid by defendant to plaintiff on account of the purchase price of the timber land and for general equitable relief.

Plaintiffs' reply denied the charges of fraud and alleged certain matters affirmatively not necessary to be set forth here.

The circuit court found that the allegations of fraud, so far as they related to Housley, Oxley and Williams, were supported by the evidence, but nevertheless entered the decree appealed from because it also found that defendant, with knowledge of the fraud, had affirmed the transaction and waived its right to rescind. The findings are not questioned by the plaintiffs in this court. In their brief they say that "unpalatable" as the findings may be, plaintiffs adopt them "as their own." The evidence of the fraudulent conspiracy is clear and cogent. The sale of the lands was negotiated by the plaintiff, J. M. Housley, with agents of the defendant, John J. Oxley and Jay A. Williams, who, with another, composed a partnership known as Linnton Plywood Management Company, which had a contract to manage the defendant's affairs. The members of the defendant association were working men with little experience in business, and it is obvious that they relied on their managing agents and had confidence in their honesty and business capacity. On May 5, 1951, Housley gave Oxley and Williams an option to purchase the property, and at the same time gave each of them his promissory note for $7,166.60 for their assistance in bringing about the expected sale. Oxley and Williams, now having two masters, served the one by deceiving the other. To further their scheme Housley procured a cruise to be made by one Rubidew, and Oxley and Williams represented to the defendant's board of directors that this cruise showed that there were 30 million board feet of timber on the lands, but that Housley did not know of the cruise and thought that the quantity was only 21.5 millions. Actually, in

1952, at the time of the sale to Willamette the quantity of timber on the lands was not in excess of 22,502,000 board feet. The other misrepresentations alleged were clearly proved. That the fraud induced the defendant to purchase the property there can be no doubt under the evidence.

■ Neither can there be any question about the correctness of the court's finding that the defendant, with knowledge of the fraud, dealt with the property as its own and must be deemed to have waived its right to rescind. See *Scott v. Walton*, 32 Or 460, 52 P 180. Actual knowledge of the fraud is not a prerequisite to ratification; "notice of acts and circumstances which would put a man of ordinary prudence and intelligence upon inquiry is equivalent in the eyes of the law to knowledge of all the facts a reasonably diligent inquiry would disclose." *Whitney v. Bissell*, 75 Or 28, 35, 146 P 141. See, also, *Wilson v. Empire Holding Corp.*, 145 Or 598, 601, 28 P2d 843; *Cameron v. Edgemont Investment Co.*, 136 Or 385, 397, 299 P 698; *Union Central Life Ins. Co. v. Kerron*, 128 Or 70, 83, 264 P 453.

■ About January 2, 1952, the defendant discharged Oxley and Williams for mismanagement. This fact, together with others, the trial court found, was evidence that the defendant had notice of facts sufficient to put it upon inquiry. On the same day the defendant gave an option to one Andrews to purchase the property for $450,000, and it continued to treat the property as its own and to endeavor to sell it even after this suit was commenced. It never offered to return the property, and never demanded restoration of the status quo. That it had knowledge of the fraud on March 28, 1952, when it filed the so-called "Answer and Counter-Claim" and pleaded the very misrepresentations which

it subsequently proved is not open to question. When, thereafter, it sold the property to Willamette Valley Lumber Company it not only gave the most convincing evidence possible of its intention to affirm the transaction but it made restoration of the status quo impossible. Its action speaks much louder than the words of its pleading. The argument that the defendant did not at that time know that Housley had given promissory notes to Oxley and Williams for their services in bringing about the sale to the defendant, and that this fact furnished a new and independent ground for rescission (see *Schuler v. Humphrey,* 198 Or 458, 481, 257 P2d 865), is not sound. That circumstance is only additional proof of the fraudulent conspiracy alleged by the defendants in their answer filed March 28, 1952. We conclude that the trial court rightly held that the defendant affirmed the transaction and lost its right to rescind. The question remains, however, whether the defendant is without remedy as against the gross fraud of which it was a victim. We think that it is not.

It is the well-established rule in this state that in a suit in equity for foreclosure of a purchase money mortgage, where the purchase was induced by the fraud of the mortgagee, the defendant may set up the damages sustained by way of recoupment or equitable defense, although the damages are unliquidated and, when the damages are ascertained, obtain an abatement of the amount due under the mortgage to the extent of the damage sustained, not exceeding, however, the amount due under the mortgage. *Smith v. Aplanalp,* 126 Or 213, 216, 267 P 1070; *Yokota v. Lindsay,* 116 Or 641, 645, 242 P 613; *Gabel v. Armstrong,* 88 Or 84, 91, 171 P 190; *Hanna v. Hope,* 86 Or 303, 168 P 618; *Kreinbring v. Mathews,* 81 Or 243, 159 P 75. The fact that the defendant sold the property does not make this

defense unavailable to it. *Smith v. Alpanalp,* supra. Nor is it important that the defendant labeled its pleading a cross-complaint and sought rescission by its prayer. "It is of no consequence that the pleader has misapprehended the legal effect of his allegations and claims for them conclusions not warranted." *Gabel v. Armstrong,* supra, 88 Or at 90. As we held in that case, the allegations of fraud are defensive and the defense is "available where the right to rescind is waived and damages are claimed by way of recoupment."

■ Here, in addition to the allegations of fraud, the answer alleges the extent of the defendant's damage thereby caused. The prayer for rescission may be disregarded for rescission is unavailable. Under the prayer for general relief the court may grant any relief within the issues and which is supported by the evidence. *Guild v. Wallis,* 130 Or 148, 156-157, 279 P 546.

■ The proof of damage here is clear and uncontradicted. It is shown that the value of the timber lands at the time of the sale to the defendant in 1951 was not greater than $226,170, the purchase price agreed upon in the sale to Willamette in 1952. The agreed purchase price in the contract of sale by the plaintiffs to the defendant was $322,000, which is at least $95,830 greater than the value of the property in 1951. This is the measure of plaintiffs' damage. It exceeds the amount owing on the note at the time of the commencement of this suit. Defendant is entitled to offset this damage to the extent of the unpaid mortgage indebtedness, and the effect is to wipe out the indebtedness. The circuit court, therefore, erred in entering a decree of foreclosure.

This court cannot in this proceeding order the resti-

tution to the defendant of the sum of $80,000 paid upon the judgment by Willamette Valley Lumber Company, but our decision is without prejudice to the enforcement by defendant of whatever rights it may have in that regard.

The decree is reversed and the suit dismissed.